UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

WILLIE "EARL" OSBEY,

    Plaintiff,

v.                        05-3276

HEALTH PROFESSIONALS LTD., et al.,

    Defendants.

## Order Granting Summary Judgment

    The plaintiff filed this case pro se, while incarcerated in the Illinois Department of Corrections. He alleged that he suffered from a life-threatening infection in his leg that the defendants refused to treat effectively through surgery and referral to an infectious disease specialist. In April 2007, James P. Baker, of the law firm Baker, Baker and Krajewski, accepted appointment as pro bono counsel. The court thanks Mr. Baker for his professionalism and his pro bono service.

    The case is now before the court on the defendants' motions for summary judgment. For the reasons below, the court concludes that, though Plaintiff had serious medical needs, no inference arises on this record of deliberate indifference. Summary judgment will therefore be granted to the defendants.

## Undisputed Facts

    Many of the facts below are adopted essentially verbatim from the medical defendants' proposed facts, to the extent not disputed by the plaintiff.

    1. Plaintiff's problems arise from a gunshot wound he suffered in 1992.

    2. At the end of 2002, the Plaintiff was charged with selling drugs and incarcerated at the Cook County Jail.

    3. Plaintiff first noticed an open sore on his left knee in January of 2003 while he was incarcerated at the Cook County Jail. Plaintiff was treated at the Cermak Hospital and was referred to Strogers Hospital for surgery. During that surgery, a rod was removed from the Plaintiff's left leg and replaced with an antibiotic rod.

    4. Plaintiff was transferred from the Cook County Jail to the Dixon Correctional Center at some point in 2003. While at Dixon, the Plaintiff again noticed drainage coming back in his left leg.

5. Plaintiff was transferred to the Lawrence Correctional Center in July of 2003. Defendant Rosalina Gonzales examined Mr. Osbey on that same day. She noted that Plaintiff was in a wheelchair and had two open sores and drainage on his left thigh. She ordered Plaintiff be allowed a wheelchair, and also ordered that the sores be cleaned with saline solution and antibiotic ointment be applied twice daily. She also ordered continued treatment for Plaintiff's seizures. The treatment of Plaintiff's seizures are not at issue in this case.

6. Dr. Rosalina Gonzales saw Plaintiff twice in August 2003. She ordered his placement in an ADA cell and a shower chair. She ordered a continuation of the daily cleansing, antibiotic ointment, and dressing changes. She ordered other medical treatment that is not relevant to Plaintiff's leg.

7. Dr. Rosalina Gonzales next followed up with the Plaintiff on September 3, 2003. On this date, Plaintiff also was able to walk in the parallel bars. She prescribed physical therapy for the Plaintiff in order to attempt to gain some strength in his legs.

8. Dr. Rosalina Gonzales next saw the Plaintiff on December 16, 2003. On this date, Dr. Rosalina Gonzales saw the Plaintiff because he had been refusing the medication she had prescribed him. He told her he no longer needed to take the Lasix or the potassium chloride because his leg was not swelling anymore because he had changed his diet. She discontinued the medicine and noted the Plaintiff's ability to walk up and down four steps.

9. Around December 2003, Mr. Osbey was transferred from Lawrence Correctional Center to the West Side Work Release Center. While at the Center, Plaintiff was being treated at Strogers Hospital in Chicago, Illinois, for continued problems with his leg. The physicians at the Strogers Hospital performed tests on his left leg and set him up for another surgery to take out the hardware in his leg.

10. Plaintiff was receiving blood work at Strogers Hospital for the surgery when he failed to call in as required by his parole release terms. He tried to explain, but was answered with threats of re-incarceration. Fearing incarceration, Plaintiff did not return to the West Side Work Release Center. For the next three months, he did not see a physician for fear of being caught. Around July 2004, Plaintiff was arrested and sent back to the Lawrence Correctional Center for violating his parole.

11. Dr. Rosalina Gonzales treated Plaintiff at Lawrence on his reincarceration. On July 22, 2004, Dr. Rosalina Gonzales ordered an X-ray of Plaintiff's left leg and a chest x-ray. She ordered the Plaintiff's left thigh be cleaned with normal saline solution and have triple anti-biotic ointment applied daily for two weeks. She ordered him be placed in an ADA cell and given a cushion for his wheelchair. She also authorized Plaintiff to have his wheelchair indefinitely.

12. Plaintiff's left hip was X-rayed on July 23, 2004. The radiologist noted that the x-ray was suspicious for chronic osteomyelitis.

13. Dr. Rosalina Gonzales saw the plaintiff several times in August and September 2004, continuing the treatment of topical and oral antibiotics, cleansing with saline solution and dressing changes. Various amounts of drainage were noted over this time period. Intermittently, Plaintiff refused to take his oral antibiotics and allow the dressing changes because he did not believe it was working. He made repeated requests for surgery. In September 2004, he had a large amount of bloody drainage from his leg, and, later in September, copious amounts of yellow drainage, along with multiple new sores. Plaintiff still refused to take his oral antibiotic.

14, Defendant Nurse Hollingsworth saw Plaintiff in July, August and September 2004, to cleanse Plaintiff's sores, apply antibiotic ointment, and change the dressing.

15. Dr. Gonzales ordered another x-ray in late September. The x-ray report indicated no fractures or osteoblastic/osteolytic lesions. Dr. Gonzales ordered daily baths and continued the same treatment plan. She saw Plaintiff several times in October and November 2004, noting improvement and minimal drainage. She ordered a complete blood count, but Plaintiff refused. Plaintiff also refused several times to have his dressing changed. Plaintiff asserts that Dr. Gonzales told him in late September that he might need surgery. From late September through October 2004, Plaintiff did take his medication consistently and allowed his dressing to be changed. The would appeared to get better but then, according to Plaintiff, got worse. In December 2004 Plaintiff refused medical treatment. Dr. Rosalina Gonzalez continued to order the treatment plan anyway, though Plaintiff refused.

16. Dr. Rosalina Gonzalez stopped working for Lawrence Correctional Center in or around January 2005. She did see Plaintiff in December 2005 and January 2006 at Pinckneyville Correctional Center, at which time she ordered Cipro and the usual treatment plan.

17. Between November of 2004 and January of 2005, Plaintiff asserts that his left leg worsened and the wound continued to ooze large amounts of pus and blood. Plaintiff complained of pain and swelling in his left leg and asked to see a specialist.

18. Defendant Dr. Julien, the Medical Director at Lawrence Correctional Center during part of the relevant time, does not recall treating Plaintiff at Lawrence Correctional Center. Dr. Julien has only three medical notes regarding Plaintiff, with the only relevant one written in April 2005, when he referred Plaintiff to orthopedic surgeon Dr. Gray. While Dr. Julien was Medical Director at Lawrence Correctional Center, Plaintiff was provided with similar care as what he had been receiving before Dr. Julien was the Medical Director.

19. Defendant Maggie Brian was the Healthcare Unit Administrator at Lawrence while Osbey was incarcerated at that facility. On several occasions, Osbey contacted Brian and asked for assistance in getting outside medical treatment from a specialist for the infection in his leg. Brian responded to Osbey that he was receiving adequate medical treatment. Brian saw the condition of Osbey's leg and observed the medical staff draining the wound on one occasion.

20. Defendant Jason Garnett was the chief administrative officer at Lawrence during

Osbey's incarceration at that facility. Garnett saw Osbey's leg when it was draining blood and pus. Osbey asked Garnett to assist him in getting better medical treatment for his leg because the infection was not getting better. Garnett informed Osbey that there was nothing he could do for Osbey because he was already being treated by the prison medical staff.

21. Defendant Nurse Hollingsworth saw the Plaintiff several times in March and April 2005. She noted Plaintiff's continued draining. An inference arises from the medical records that the draining had gotten worse.

22. Around 4:00 a.m. on March 30, 2005 an abscess in Plaintiff's left leg burst and oozed pus and blood. Osbey showed Warden Garnett that his leg was oozing pus and blood and asked for help to see other doctors. Plaintiff was frightened for his health and asked to be seen in the Crisis Center, believing it was a medical emergency.

23. According to Plaintiff (whose version the court accepts on summary judgment), Defendant Nurse Hollingsworth came to see Plaintiff after he declared a crisis and told him there was no medical emergency, and that Plaintiff could wait until morning. On March 31, 2005, Hollingsworth cleaned his leg and changed his dressing.

24. Defendant Waltz wrote Plaintiff a ticket, charging him with giving false information to an employee, because Plaintiff had improperly called a "crisis" when none existed. The disciplinary ticket was expunged.

25. Between March and May of 2005 Osbey's leg remained infected and the course of treatment did not change. Throughout that time the physicians that saw him in the Department of Corrections continued to treat him with antibiotics and dressing changes.

26. In or around April 2005, Dr. Julien was replaced by Dr. Fatoki as the Medical Director at the Lawrence Correctional Center. Plaintiff has no complaints regarding the care received from Dr. Fatoki.

27. Dr. Fatoki sent the Plaintiff out for surgery on April 18, 2005.

28. Plaintiff underwent surgery by Dr. Gray in May of 2005, in Effingham, Illinois.

29. During the surgery, Dr. Gray removed the rod in the Plaintiff's left leg. However, he did not remove the wire that was wrapped around the Plaintiff's femur because he felt it was necessary to hold the bone together. The post-surgical report shows that Gray believed the area where the wire remained was a "nidus" for infection.

30. Following the surgery to remove the rod, Osbey's left leg continued to ooze pus and blood. Between July 4 and 7, 2005, Osbey made repeated requests for treatment by a specialist for the infection in the leg which were refused.

31. After the surgery performed by Dr. Gray, Defendant Nurse Hollingsworth saw Plaintiff several times from May through July 19, 2005, for dressing changes. In June, she noted moderate yellow drainage coming from Plaintiff's leg.

32. Plaintiff was seen by Dr. Gray in a follow-up appointments after his surgery. Plaintiff's understanding from those visits was that Dr. Gray believed that further surgeries were probably necessary, as well as a consultation with an infectious disease specialist. There is June 2005 recommendation in the record, purportedly from Dr. Gray, which states, "Pt: would benefit from a tertiary care facility that includes an infection specialist. Recommend referral. Follow up as needed." (d/e 29, p. 12).

33. Plaintiff was transferred to the Pinckneyville Correctional Center in July of 2005. Plaintiff was given a reception screening by Sandra Hill, RN, upon his arrival at the Pinckneyville Correctional Center. Plaintiff was put in for sick call, special housing, and for chronic clinics. On that same day, Dr. Feinerman evaluated Plaintiff's condition and status and ordered a treatment plan of continuing the Bactrim, dressing changes, and a low bunk/gallery permit and wheelchair.

34. On July 20, 2005, Dr. Feinerman admitted Plaintiff into the infirmary at the Pinckneyville Correctional Center with an admitting diagnosis of impaired skin integrity. Plaintiff was admitted to the infirmary for a possible Methicillin Resistant Strains of Staphylococcus Aureus (MRSA) in his left femur. Plaintiff remained in the infirmary with around the clock care until July 22, 2005. This care included routine evaluations and administration of prescribed antibiotics for Plaintiff's leg and other matters.

35. From July to December of 2005 Osbey continued to struggle with the infection in his leg. The wound continued to ooze blood and pus throughout that period of time. During that time the treatment plan of topical and oral antibiotics, saline solution cleansings, and dressing changes was not altered.

36 . Plaintiff was examined by a registered nurse and Dr. Sanford upon his discharge from the infirmary. (Exhibits A, A-13, and A-14). Plaintiff was discharged with orders to follow up one week later. Dr. Sanford noted the Plaintiff had no draining, bleeding, or swelling on his upper left leg.

37 . Plaintiff was next seen by Dr. Rayford on July 29, 2005. Dr. Rayford ordered continuation of the antibiotic Bactrim (double strength) was to continue, with a follow-up with the doctor in two weeks.

38. Plaintiff was next seen on August 5, 2005 by Dr. Rayford. He was given another examination. That note reflects that the left thigh was healed.

39 . The Plaintiff was seen by Dr. Rayford on August 18, 2005. Plaintiff requested to be seen by an outside physician at that time. Dr. Rayford noted that there was no need for a

consultation at that time because the thigh had healed.

40. In November 2005 Plaintiff filed this lawsuit pro se, seeking a consultation with an infectious disease specialist and further surgery to fix the infection in his leg, which he alleged was causing massive swelling, chronic and excruciating pain, and substantial amounts of yellow and green pus drainage.

41. The next time Plaintiff was seen for complaints involving his left leg was on December 13, 2005. At that time, Dr. Shepard's objective findings were that the Plaintiff suffered a chronic serious drainage. His plan of treatment was to take a left hip and femur X-ray, check aerobic culture of left chronic thigh drainage/wound culture and sensitivity; check weekly, supply of gauze and paper tape for one month; and check possible orthopedic referral.

42. On December 15, 2005, an X-ray was taken of Plaintiff's left leg and was compared to an X-ray taken eight months prior on April 8, 2005 by an outside physician. The X-ray report suggested that the patient had chronic osteomyelitis but that the position of the femur had not changed. Based on his reviews of the X-rays on December 20, 2005, Dr. Feinerman concluded that Plaintiff did not need to be referred out to an orthopedic physician.

43. The Plaintiff was next seen on December 31, 2005 by Dr. Rosalina Gonzales. The Plaintiff appeared for an X-ray review. Dr. Gonzales prescribed Cipro 500 mg to be taken orally twice a day for 30 days.

44. Between December of 2005 and June of 2006, Osbey continued to struggle with the infection in his leg. The left thigh continued to drain pus and blood in varying amounts and frequency throughout this time. No changes were made to the prescribed treatment of antibiotics, cleansing and dressing changes.

45. On June 20, 2006, Dr. Feinerman referred the Plaintiff to be seen by Dr. Pulisetty, an orthopedic specialist at the Kenneth Hall Regional Hospital in East St. Louis, Illinois. Dr. Pulisetty found no obvious osteomyelitis present, either on examination or by X-ray. He also found that the patient's fracture was well healed.

46. Dr. Pulisetty did recommend that a bone scan be completed. Dr. Feinerman agreed with Dr. Pulisetty's recommendation and ordered a bone scan.

47. Dr. Feinerman next saw the patient on July 24, 2006. He reviewed the bone scan report and discussed it with Plaintiff.

48. On August 23, 2006, Robin Biermann, M.D., of the Pinckneyville Community Hospital, provided a second interpretation of the bone scan. Dr. Biermann stated that a diagnosis of osteomyelitis could not be made with certainty, but that it was strongly suspected.

49. Dr. Feinerman did not see Plaintiff again until September 11, 2006. In the interim, the

patient was seen routinely by another staff physician, Dr. Mathis. Dr. Mathis saw Plaintiff in the infirmary on August 30, 2006. Dr.Mathis' note states the Plaintiff was "brought to infirmary this morning due to large amount drainage from left lat thigh abscess at multiple sites, pus drainage." Dr. Mathis' plan was to incise and drain the area. The risk/benefits were explained to Plaintiff, who signed a consent. The medical notes observe a large amount of drainage and no complications. Dr. Mathis ordered 24-hour observations; change dressing at shift for 24 hours; a continuation of the Bactrim and Dilantin, and Tylenol. Dr. Mathis' note stated "Will discuss referral to ortho/Gen. Surgery or Internal Disease for evaluation for need for collegial consultation. Request faxed."

50. On September 1, 2006, the Plaintiff's lab work returned with a positive finding for MRSA and the Plaintiff was prescribed Rifampin 300 mg for 14 days by Dr. Mathis. Plaintiff was next seen on September 7, 2006 by Dr. Mathis. The note reflects a large amount of yellow-green discharge. The note also reflects that a referral for surgical evaluation was pending with Wexford.

51. Dr. Feinerman next saw the patient on September 11, 2006 for a review. His note states the swelling had resolved and there was no discharge. Dr. Feinerman continued the Bactrim and Flagul. Dr. Feinerman also noticed that Dr. Mathis had requested a referral for a surgical evaluation of Plaintiff's leg, but no decision had yet been made by Wexford on this issue.

52. Dr. Feinerman saw the patient for a review on September 18, 2006. His note stated that Plaintiff was being referred to a surgeon.

53. On October 11, 2006, Wexford approved the referral to the outside physician and the Plaintiff was scheduled to see Dr. Petkovich, an orthopedic surgeon in Belleville, IL, on October 31, 2006.

54. On October 31, 2006, the Plaintiff was seen by Dr. Frank Petkovich at the St. Clair Orthopedics in Belleville, Illinois. Dr. Petkovich requested further evaluation with new X-rays of the left leg from the knee to the hip. He also requested a CT scan of his left thigh and entire femoral shaft. Finally, Dr. Petkovich requested to reevaluate the patient in approximately three weeks to review the results of the requested tests. Dr. Feinerman approved Dr. Petrovich's requests and ordered the X-rays and requested the CT scan that he suggested.

55. The X-rays requested by Dr. Petkovich and ordered by Dr. Feinerman were performed on November 1, 2006. However, Plaintiff did not appear for scheduled treatment on November 9, 2006. (Exhibits A and A-50).

56. The request for the CT scan was faxed to Wexford on November 13, 2006. Dr. Feinerman next saw the patient on November 20, 2006. At this visit, he informed Plaintiff that he had been approved for the CT scan and noted the continued drainage from Plaintiff's thigh.

57. Dr. Feinerman made a note in Plaintiff's records on November 27, 2006 that the Plaintiff was okay to follow up with the orthopedic surgeon after the CT scan of his femur was performed.

58. On November 28, 2006, the Plaintiff was scheduled for a CT scan of his left femur at St. Elizabeth's Hospital on 12/1/06 at 9:00 a.m. He was also scheduled for a follow up visit with Dr. Petkovich in Belleville on 12/5/06. On December 1, 2006, the Plaintiff's CT scan had to be cancelled due to the weather conditions. It was rescheduled for December 7, 2006.

59. Plaintiff had a CT scan performed on his left leg on December 7, 2006 at the Pinckneyville Community Hospital.

60. Plaintiff was next seen by Dr. Larson on December 10 and 17, 2006. Dr. Larson's notes reflect continued drainage and a continuation of the antibiotics.

61. Plaintiff was next seen by Dr. Petkovich. Dr. Petkovich reviewed the results of the Plaintiff's CT scan. Dr. Petkovich wrote a letter addressed to Dr. Mathis dated December 19, 2006. Dr. Petkovich diagnosed a "probable underlying osteomyelitis left femur." Dr. Petkovich's plan was: "I have explained to the patient that this is a difficult condition to treat. I have likewise told him that I do not treat problems like this and I would recommend that he be seen back in the university setting where he had the original surgery, which was at Cook County Hospital in Chicago, Illinois. In the meantime, he may continue with daily dressing changes p.r.n. He was given no prescriptions by me today." Dr. Petkovich further stated: "He will follow-up with his other physicians who performed the above surgery. I have told him that it would be unnecessary to see him in follow-up and again I would recommend that he make an appointment with the surgeons who performed the original procedure on this extremity. He should in fact make an appointment to see them as soon as possible to prevent this from getting worse."

62. Defendant Christine Brown was the healthcare unit administrator at Pinckneyville during the time Osbey was incarcerated in that facility. Osbey filed several grievances during his period of incarceration at that facility which were reviewed by Christine Brown. The crux of those grievances was that Osbey wanted assistance in obtaining medical care from a specialist for the infection in his left leg. Christine Brown took no steps to investigate or pursue those requests.

63. On February 2, 2007, the Plaintiff was approved by Wexford to be seen at the University of Illinois-Chicago. Plaintiff was transferred from the Pinckneyville Correctional Center to Stateville Correctional Center and subsequently Dr. Feinerman's care, on March 8, 2007 in order to facilitate his treatment at the University of Illinois-Chicago. Plaintiff was referred to University of Illinois-Chicago for further evaluation and assessment.

64. On three separate occasions between September and November of 2006, after notifying Christine Brown of the problems with the medical treatment, Osbey was dropped off the medical line because he did not receive a medical pass to be treated for the problems with his

leg.  He did not seek a medical pass because he had been treated previously and the staff was aware of his condition.

65. Defendant Julius Flagg was an assistant warden of programs at Pinckneyville during the time Osbey was incarcerated at that facility. Flagg refused to look at Osbey's wound despite Osbey's requests that he look at the wound and then help him get better medical care.

66.  In April, 2007, Mr. James P. Baker accepted appointment as pro bono counsel for Plaintiff and filed his appearance.  Discovery ensued, followed by the summary judgment motions presently before the court.

67.  Plaintiff was seen by Dr. Mark Gonzalez at University of Illinois-Chicago in June of 2007.

68.  Dr. Gonzalez diagnosed Plaintiff with osetomyelitis of his left femur.  Osteomyelitis is an infection of the bone.  According to the CT scan, it looks like a large amount of the femur is involved and that concerns Dr. Gonzalez.  However, Dr. Gonzalez thinks the bone is still solid because he has observed Plaintiff walking and because the bone hasn't fractured over the many years it has been draining.

69. Dr. Gonzalez believes that the bullet introduced the infection in Mr. Osbey's leg in 1992.  Gunshot wounds by nature can cause deep infections.

70.  According to Dr. Gonzalez, osteomyelitis of the femur can be chronic and very difficult to eradicate.  The symptoms caused by an infection such as Plaintiff's can come and go over the course of the infection.  The course of the infection is difficult to predict and surgery is not a sure cure.  It is possible for a person who suffers from osteomyelitis to not have any significant symptoms for years.  Plaintiff's osteomyelitis, however, is serious.  It puts Plaintiff at risk of losing his leg, with or without surgery.

71.  When Dr. Gonzalez saw the Plaintiff in June of 2007, Mr. Osbey's condition was not emergent.  The fact that Plaintiff's infection had already been going on for years indicated to Dr. Gonzalez that the Plaintiff's condition was not emergent.  Dr. Gonzalez was also aware that the Plaintiff was going to be released from prison and was going to be moving more locally to the University of Illinois - Chicago and in Dr. Gonzalez's opinion, this would make him easier to manage as a patient.

72. On October 30, 2007, Dr. Gonzalez again saw Plaintiff.  The plan at that time was for Dr. Gonzalez to perform surgery to try to eradicate whatever is causing Mr. Obsey's infection.  The surgery would entail irrigation and debridement and also possible intramedullary reaming.  Dr. Gonzalez would also place an antibiotic cement rod in the Plaintiff's left leg and take cultures to determine the type of infection, in order to correctly target antibiotic therapy.  Dr. Gonzalez planned to consult with an infectious disease specialist after the surgery on Mr. Osbey.  Dr. Gonzalez expected an infectious disease specialist to help determine what type of

antibiotics or other medications to provide Mr. Osbey, depending on what the cultures of the bone infection indicate.

73. Plaintiff was released on MSR on November 9, 2007.

74. Gonzalez saw Mr. Osbey on November 28, 2007. At that time, Mr. Osbey had no motor or sensory deficit on his left lower extremity.

75. The surgery that Dr. Gonzalez recommended is not a sure cure. Dr. Gonzalez has explained to Plaintiff that the chronicity of his infection for 15 or 16 years portends a guarded outcome for being able to eradicate the infection. Infections can be somewhat unpredictable in treating. Dr. Gonzalez may not be able to open the bone and get into any lytic areas because he could weaken the bone too much. If Mr. Osbey does not suffer any recurrences of drainage for a year after the surgery, in Dr. Gonzalez's opinion, that's a very good sign. However, Dr. Gonzalez has seen infections come back ten or fifteen years later. Generally after a year or two, if they don't come back, the patient is in good shape. However, an infection can start again after a very extended period of time.

76. In Dr. Gonzalez's opinion, Mr. Osbey's medical condition will be better if he undergoes surgery as opposed to leaving it without surgery. Dr.Gonzalez is recommending surgery for Mr.Osbey because antibiotics should clear up an infection in six to eight weeks. The fact that Mr. Osbey has had a chronic infection probably ten to fifteen years with on and off drainage for most of that time implies that there is a deep infection in the bone that cannot be cleared up with antibiotics alone.

77. Without surgery, Mr. Osbey's condition could remain as it is for the next 20 to 25 years.

78. Dr. Gonzalez saw Plaintiff at some point in January 2008. At that time, Dr. Gonzalez scheduled Mr. Osbey for surgery in February 2008. However Plaintiff cancelled this surgery for reasons not in the record. Plaintiff avers in his October 2008 affidavit that he is being treated with intravenous antibiotics and is tentatively scheduled for surgery. Whether that surgery has occurred is not in the record.

79. As of February 11, 2008, the date of Dr. Gonzalez' deposition, Mr. Osbey's infection had not spread to other areas in his body. Mr. Osbey had not developed any sort of malignancy with respect to his left leg. Mr.Osbey had no medical issues with his right lower extremity.

## Analysis

### I. ADA and RA

Plaintiff is voluntarily dismissing his ADA and RA claims, so they need not be addressed.

## II. Retaliation for Exercise of First Amendment Rights

In its merit review of the complaint, the court identified a claim that Defendants Gonzales, Julien, Hollingsworth, Brian and Waltz retaliated against the plaintiff for filing grievances. Plaintiff does not address the retaliation claim in his response, so it is waived. In any event, the court does not see any evidence that Defendants' actions were motivated by retaliation for Plaintiff's grievances, or that Defendants would have acted differently even if they did harbor retaliatory animus. Accordingly, summary judgment is granted to Defendants the retaliation claim.

## III. Eighth Amendment: Deliberate Indifference to Serious Medical Needs

Deliberate indifference to a serious injury or medical need violates a prisoner's rights under the Eighth Amendment to be free from cruel and unusual punishment. *Chapman v. Keltner*, 241 F.3d 842, 845 (7th Cir. 2001); *Wynn v. Southward*, 251 F.3d 588, 593 (7th Cir. 2001), *citing Estelle v. Gamble*, 429 U.S. 153, 182-83 (1976). The injury or need must be objectively serious, *and* the official must personally know of the risk and consciously disregard it. *See Henderson v. Sheahan*, 196 F.3d 839, 845 (7th Cir. 1999); *Mathis v. Fairman*, 120 F.3d 88. 91 (7th Cir. 1997); *Wynn v. Southward*, 251 F.3d at 593 (2001).

An objectively serious injury or medical need is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Chapman*, 241 F.3d at 845, *quoting Zentmyer v. Kendall County* 220 F.3d 805, 810 (7th Cir. 2000)(*quoting Gutierrez v. Peters* 111 F.3d 1364, 1373 (7th Cir. 1997)). Plaintiff's osteomyelitis is clearly a serious medical need. Every physician who examined Plaintiff mandated treatment, though not necessarily surgery. The description of Plaintiff's leg would lead even a layperson to conclude a doctor's attention was necessary.

The subjective component, deliberate indifference, is a high hurdle. To demonstrate deliberate indifference, [a plaintiff] must show that the defendants 'acted with a sufficiently culpable state of mind.'" *Johnson v. Snyder*, 444 F.3d 579, 585 (7th Cir. 2006)(Citations omitted). Deliberate indifference is more than negligence or even gross negligence. It is more than a difference of professional disagreement. *Steele v. Choi*, 82 F.3d 175, 178-79 (7th Cir. 1996); *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996). Deliberate indifference "'approaches intentional wrongdoing,'""'essentially a criminal recklessness standard, that is, ignoring a known risk.'" *Id.* Plaintiff must "show that the prison official was subjectively aware of the prisoner's serious medical needs and disregarded an excessive risk that a lack of treatment posed to the prisoner's health or safety." *Wynn*, 251 F.3d at 593, *citing Farmer v. Brennan*, 511 U.S. at 837; *Zentmyer*, 220 F.3d at 811. Deliberate indifference be inferred "when the medical professional's decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate the person responsible did not base the decision on such a judgment." *Estate of Cole v. Pardue*, 94 F.3d 254, 261-62 (7th Cir. 1996); *see also Collingnon v. Milwaukee County*, 163 F.3d 982, 989 (7th Cir. 1998)(deliberate indifference may be established

if "response so inadequate that it demonstrated an absence of professional judgment, that is, that nominally competent professional would not have so responded under the circumstances.").

Plaintiff argues that an inference of deliberate indifference arises from Defendants' continued use of the same ineffective treatment--topical and oral antibiotics, cleansing with saline solution and dressing changes. Plaintiff contends that "this method of treatment was not working and was allowing Osbey to continue to suffer. The continuous suffering . . . and the failure . . . to explore other options for treatment raises a question for the jury regarding whether they were deliberately indifferent to his medical needs." (d/e 172, p. 15). Plaintiff argues that deliberate indifference is a question for the jury because Defendants knew their treatment was ineffective but prescribed it anyway. *See Kelly v. McGinnis*, 899 F.2d 612, 616 (7th Cir. 1990)(inmate can recover "if he can prove that the clinic personnel deliberately gave him a certain kind of treatment knowing that it was ineffective, either as a means of toying with him or as a way of choosing 'the "easier and less efficacious treatment"'")(*quoting Estelle v. Gamble*, 429 U.S. 97, 104 n. 10 (1976)(other citation omitted).

However, whether Plaintiff's osteomyelitis even *can* be effectively treated is not established. The record shows that chronic osteomyelitis is a complicated condition that is difficult to treat and can be very difficult to eradicate. The course of the infection is difficult to predict and surgery is not a sure cure. Surgery and consultation with an infectious disease specialist is what Plaintiff asserts he needed. Yet surgery has not worked up to this point, as demonstrated by Plaintiff's surgeries in 2003 and in 2005. Dr. Gonzalez, who will perform Plaintiff's third surgery, does believe that Plaintiff is better off trying the third surgery and also stated that antibiotics alone would not eradicate the infection. However, Dr. Gray confirmed that surgery might not work, characterizing the outcome as "guarded," in light of Plaintiff's long-time chronic infection. For example, Dr. Gonzalez acknowledged that he may not be able to remove all the infection-causing material for fear of weakening the bone, as Dr. Gray concluded when he did surgery in 2005. As for an infectious disease specialist, one is needed only after a culture is taken during surgery, not before, according to Dr. Gonzalez. On this record, no inference arises that surgery is an effective treatment for Plaintiff's condition or that consultation with an infectious disease specialist was warranted.

There is also no inference that the medical defendants' decisions were a substantial departure from accepted professional judgment. Dr. Gonzalez did not criticize any of the other treating physicians. It is true that the antibiotics, cleansings and dressing changes did not eradicate the infection, nor could they reasonable be expected to do so, according to Dr. Gray. However, Plaintiff does not address whether this treatment helped keep his condition from worsening or helped his pain. In any event, even if the treatment prescribed had no beneficial effect, there is no evidence that another route would have been more effective or better reduced Plaintiff's pain. Further, even Dr. Gonzalez, who believes Plaintiff will be better off with surgery, did not feel the surgery was imminently necessary but could wait until Plaintiff was released. Dr. Gonzalez scheduled the surgery for about eight months after Plaintiff first came to see him. Plaintiff himself missed that surgery and had still not had it as of October 2008. According to Dr. Gonzalez, it is not uncommon for infections like Plaintiff's to wax and wane

over the years, and Plaintiff's infection may remain as it is, waxing and waning, for years. Lastly, the medical defendants did more than prescribe antibiotics. Plaintiff had multiple x-rays, blood tests, bone scans, a consultation with an orthopedic specialist, and consultations with two orthopedic surgeons.

In sum, Plaintiff clearly suffers from a serious medical condition that is difficult to treat, but there is no evidence that the medical defendants were deliberately indifferent to that condition. The non-medical defendants were entitled to rely on the decisions of the medical defendants. Even though the seriousness of Plaintiff's condition would be obvious to a layperson, it's proper treatment would not. There is no evidence that the non-medical defendants' hindered Plaintiff's access to medical care or interfered with prescribed treatment. Thus, summary judgment is mandated for all defendants.

**IT IS THEREFORE ORDERED:**

1) Pursuant to Plaintiff's voluntary dismissal (d/e 172, p. 2), Plaintiff's claims under the Americans with Disabilities Act and the Rehabilitation Act are dismissed.

2) Pursuant to Plaintiff's voluntary dismissal (d/e 172, p. 2), Defendants Illinois Department of Corrections, Lawrence Correctional Center, and Roger E. Walker are dismissed.

3) The defendants' motions for summary judgment are granted (d/e's 165, 166). The clerk of the court is directed to enter judgment in favor of the defendants and against the plaintiff. All pending motions are denied as moot, and this case is terminated, with the parties to bear their own costs. The final pretrial conference and trial dates are vacated.

4) Mr. James P. Baker's appointment as pro bono counsel is terminated.[1] The court thanks Mr. Baker for his hard work and professionalism. The plaintiff proceeds pro se from the entry of this order, unless he secures counsel on his own.

5) If the plaintiff wishes to appeal this dismissal, he may file a notice of appeal with this court within 30 days of the entry of judgment. Fed. R. App. P. 4(a)(4). A motion for leave to appeal in forma pauperis should set forth the issues the plaintiff plans to present on appeal. See Fed. R. App. P. 24(a)(1)(C). If the plaintiff does choose to appeal, he will be liable for the $455.00 appellate filing fee irrespective of the outcome of the appeal. Furthermore, if the appeal is found to be non-meritorious, the plaintiff may also accumulate another strike under 28 U.S.C. 1915(g).

---

[1] The court has limited funds available to reimburse pro bono counsel for out of pocket advancements made in the case. If counsel has made such advancements he should apply to the court for reimbursement with supporting documentation within thirty days.

Entered this <u>22nd</u> Day of <u>January</u>, 2009.

<u>s\Harold A. Baker</u>
HAROLD A. BAKER
UNITED STATES DISTRICT JUDGE
